# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | ) ) ) ) | Master File No. 12-md-02311 |
| In re:<br><br>BEARINGS CASES<br><br>THIS DOCUMENT RELATES TO:<br><br>Rush Truck Centers of Arizona, Inc.; Rush Truck Centers of California, Inc.; Rush Truck Centers of Colorado, Inc.; Rush Truck Centers of Florida, Inc.; Rush Truck Centers of Georgia, Inc.; Rush Truck Centers of Idaho, Inc.; Rush Truck Centers of Illinois, Inc.; Rush Truck Centers of Indiana, Inc.; Rush Truck Centers of Kansas, Inc.; Rush Truck Centers of Missouri, Inc.; Rush Truck Centers of North Carolina, Inc.; Rush Truck Centers of Ohio, Inc.; Rush Truck Centers of Oklahoma, Inc.; Rush Truck Centers of Oregon, Inc.; Rush Truck Centers of Tennessee, Inc.; Rush Truck Centers of Texas, LP.; Rush Truck Centers of Utah, Inc., and Rush Truck Centers of Virginia, Inc., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JTEKT Corporation; Koyo Corporation of U.S.A.; Nachi-Fujikoshi Corp.; Nachi America Inc.; NSK Ltd.; NSK Americas, Inc.; Schaeffler Group USA Inc.; SKF USA, Inc.; NTN Corporation; and NTN USA Corporation,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. _____<br><br>**Jury Trial Demanded** |

## CLASS ACTION COMPLAINT

PLAINTIFFS Rush Truck Centers of Arizona, Inc. ("Rush AZ"), Rush Truck Centers of California, Inc. ("Rush CA"), Rush Truck Centers of Colorado, Inc. ("Rush CO"), Rush Truck Centers of Florida, Inc. ("Rush FL"), Rush Truck Centers of Georgia, Inc. ("Rush GA"), Rush Truck Centers of Idaho, Inc. ("Rush ID"), Rush Truck Centers of Illinois, Inc. ("Rush IL"); Rush Truck Centers of Indiana, Inc. ("Rush IN"); Rush Truck Centers of Kansas, Inc. ("Rush KS"), Rush Truck Centers of North Carolina, Inc. ("Rush NC"), Rush Truck Centers of Ohio, Inc. ("Rush OH"), Rush Truck Centers of Oklahoma, Inc. ("Rush OK"), Rush Truck Centers of Oregon, Inc. ("Rush OR"); Rush Truck Centers of Tennessee, Inc. ("Rush TN"); Rush Truck Centers of Texas, LP. ("Rush TX"); Rush Truck Centers of Utah, Inc. ("Rush UT"); and Rush Truck Centers of Virginia, Inc. ("Rush VA"), (collectively "Plaintiffs") file this Consolidated Class Complaint on behalf of themselves and all other similarly situated dealers of medium- and heavy-duty trucks, buses, commercial vehicles, construction equipment, mining equipment, agricultural equipment, railway vehicles, and other similar vehicles (the "Classes" as defined below).

Plaintiffs bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, and consumer protection laws, demand a trial by jury, and allege as follows:

### NATURE OF ACTION

1.      Plaintiffs bring this lawsuit as a proposed class action against the Defendants (defined below), manufacturers, and suppliers of vehicle bearings (defined below) globally and in the United States for engaging in a lengthy conspiracy to suppress and eliminate competition in the bearings industry by agreeing to fix, stabilize, and maintain the prices of these products,

DM1\4908432.1

which were sold to truck and equipment manufacturers and other manufacturers in the United States and elsewhere.

2.      "Bearings" refers to bearings used in heavy-duty (Class 8) trucks, medium-duty (Class 4, 5, 6 & 7) trucks, buses, commercial vehicles, construction equipment, mining equipment, agricultural equipment, railway vehicles, and other similar vehicles (collectively, "Vehicles").  Examples of types of Bearings include, without limitation, ball bearings, tapered roller bearings, roller bearings, and mounted bearings.

3.      The "Class Period" refers to January 1, 2004 to the present.

4.      The Defendants manufacture, market, and sell Bearings throughout the United States and in other countries for use in, among other things, Vehicles.

5.      Vehicles containing Bearings, as well as Bearings themselves, made by Defendants, are sold in every state of the United States and the District of Columbia and were purchased by Plaintiffs and other truck and/or equipment dealers.

6.      The Defendants and other as yet unknown co-conspirators agreed, combined, and conspired to fix, stabilize, and maintain the prices of Bearings.  They carried out their conspiracy by agreeing, during meetings and conversations, to fix the prices of Bearings.  Defendants then sold Bearings at noncompetitive prices to truck and equipment manufacturers and other manufacturers in the United States and elsewhere, for sale in United States, which manufacturers, in turn, sold the Bearings, and/or Vehicles and parts for Vehicles containing the Bearings, to Plaintiffs and other truck and/or equipment dealers.

7.      Defendants' conduct is the subject of a global criminal investigation being conducted by competition authorities in the United States, the European Union, South Korea, Singapore, Australia, Canada, Japan, and China.

8.      As part of its criminal investigation, the United States Department of Justice ("DOJ") has sought and is seeking information from Defendants and others about anticompetitive conduct in the market for Bearings.  The European Commission Competition Authority ("EC") has conducted raids at the European offices of several of the Defendants in connection with investigating allegations of anticompetitive conduct in the market for Bearings.

9.      The Japan Fair Trade Commission ("JFTC") began an investigation into anticompetitive activity by Bearings manufacturers in July 2011 after JTEKT Corporation reported the Bearings cartel to the JFTC as part of a bid for leniency.  Officials of NSK Ltd. and Nachi-Fujikoshi Corp. have also admitted their roles in the Bearings cartel.

10.      On June 14, 2012, the JFTC filed a criminal accusation alleging a criminal violation of the Japan's Antimonopoly Act against NSK Ltd, NTN Corp., and Nachi-Fujikoshi Corp.

11.      On December 28, 2012, Nachi-Fujikoshi Corp. and two of its executives were convicted in Tokyo District Court of violating Japan's Antimonopoly Act.

12.      On February 25, 2013, Defendant NSK Ltd. announced that the company was sentenced to a penalty of 380 million yen by the Tokyo District Court for violation of the Antimonopoly Act of Japan regarding sales of Bearings as a result of the June 14, 2012 prosecution by the Tokyo District Public Prosecutors Office.  In addition, two of NSK's former officers and a former employee received suspended sentences.

13.      On March 29, 2013, the JFTC issued cease and desist orders and surcharge payment orders based on violations of the Japan Antimonopoly Act against NTN Corp., NSK Ltd. and Nachi-Fujikoshi Corp, for conspiring to fix prices on "industrial machinery bearings and automotive bearings."  The JFTC also noted that JTEKT Corporation had violated the

4

Antimonopoly Act through its participation in the conspiracy, but was not subject to the cease and desist order.

14.     On September 26, 2013, the United Stated Department of Justice announced that JTEKT Corporation was being fined $103 million and NSK Ltd. was being fined $68 million for engaging in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of Bearings.

15.     JTEKT Corporation and NSK Ltd. both have entered guilty pleas in Canada to engaging in the Bearings conspiracy in violation of Canadian competition laws. NSK was fined $4.5 million and JTEKT was fined $5 million for violating the Canadian Competition Act.

16.     On March 19, 2014, the EC announced that it had found that SKF, Schaeffler, JTEKT Corporation, NSK Ltd., Nachi-Fujikoshi, and NTN had operated a cartel in the market for car and truck bearings and fined all those companies (excluding JTEKT, which benefitted from immunity for having revealed the existence of the cartel to the EC) a collective EUR 953 million.

17.     On August 19, 2014, China's National Development and Reform Commission announced that it had handed down a 174.92 million yuan penalty against NSK and a 119.16 million yuan fine against NTN for violating China's antitrust law in connection with the Bearings cartel.

18.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Class paid artificially inflated prices for Bearings and for Vehicles and Vehicle parts containing Bearings.  Plaintiffs and the members of the Classes have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

19.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violation of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

20.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction over the state law claims in this action, pursuant to 28 U.S.C. §§ 1332(d) and 1367, because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of different states than some Defendants.

21.     Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

22.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States

6

subsidiaries, *inter alia:* (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Bearings throughout the United States that were specifically designed for vehicles that were intended to be sold in the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; (d) was through its own actions and through the actions of its co-conspirators, engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States; (e) targeted customers in the United States, including this district, and/or (f) engaged in actions in furtherance of an illegal conspiracy in this district either itself or through its co-conspirators. Defendants also conduct business throughout the United States, including in this district, and they have purposefully availed themselves of the laws of the United States and this district.

23. Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, reasonably foreseeable, and intended anti-competitive effects upon interstate commerce within the United States and upon import trade and commerce into the United States.

24. The activities of Defendants and their co-conspirators were within the flow of, were intended to have, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

25. Bearings manufactured abroad by Defendants and sold for use in trucks and equipment either manufactured in the United States or manufactured abroad and sold in the United States are goods brought into the United States for sale and, as such, constitute import

commerce.  To the extent any Bearings are purchased in the United States and such Bearings do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had and continue to have, a direct substantial, and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct and its effect on United States commerce described herein proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

26.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents engaged in activities affecting all states to fix or inflate prices of Bearings, and that conspiracy unreasonably restrained trade and adversely affected the market for Bearings.

27.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Bearings, including Plaintiffs and the Classes.

## PARTIES

### The Plaintiffs

28.     Plaintiff Rush AZ is a Delaware corporation with its principal place of business in Arizona.  Rush AZ is an authorized Peterbilt and Hino dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

29.     During the Class Period Rush AZ purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators.  Rush AZ also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush AZ purchased and received both

8

the afore-mentioned Vehicles and Bearings in Arizona.  Rush AZ has also displayed, sold, and advertised Vehicles in Arizona during the Class Period.

30.     Plaintiff Rush CA is a Delaware corporation with its principal place of business in California.  Rush CA is an authorized Peterbilt, Hino, Isuzu, and Ford dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

31.     During the Class Period Rush CA purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators.  Rush CA also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush CA purchased and received both the afore-mentioned Vehicles and Bearings in California.  Rush CA has also displayed, sold, and advertised Vehicles in California during the Class Period.

32.     Plaintiff Rush CO is a Delaware corporation with its principal place of business in Colorado.  Rush CO is an authorized Peterbilt, Isuzu, and Ford dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

33.     During the Class Period Rush CO purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators.  Rush CO also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush CO purchased and received both

DM1\4908432.1

the afore-mentioned Vehicles and Bearings in Colorado.  Rush CO has also displayed, sold, and advertised Vehicles in Colorado during the Class Period.

34.     Plaintiff Rush FL is a Delaware corporation with its principal place of business in Florida.  Rush FL is an authorized Peterbilt, Hino, and Isuzu dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

35.     During the Class Period Rush FL purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators.  Rush FL also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush FL purchased and received both the afore-mentioned Vehicles and Bearings in Florida.  Rush FL has also displayed, sold, and advertised Vehicles in Florida during the Class Period.

36.     Plaintiff Rush GA is a Delaware corporation with its principal place of business in Georgia.  Rush GA is an authorized International, Hino, Isuzu, and IC Bus dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

37.     During the Class Period Rush GA purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators.  Rush GA also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush GA purchased and received both

10

the afore-mentioned Vehicles and Bearings in Georgia.  Rush GA has also displayed, sold, and advertised Vehicles in Georgia during the Class Period.

38.     Plaintiff Rush ID is a Delaware corporation with its principal place of business in Idaho.  Rush ID is an authorized International, Autocar, and IC Bus dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

39.     During the Class Period Rush ID purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators.  Rush ID also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush ID purchased and received both the afore-mentioned Vehicles and Bearings in Idaho.  Rush ID has also displayed, sold, and advertised Vehicles in Idaho during the Class Period.

40.     Plaintiff Rush IL is a Delaware corporation with its principal place of business in Illinois.  Rush IL is an authorized International dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

41.     During the Class Period Rush IL purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators.  Rush IL also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush IL purchased and received both the afore-

11

mentioned Vehicles and Bearings in Illinois. Rush IL has also displayed, sold, and advertised Vehicles in Illinois during the Class Period.

42.     Plaintiff Rush IN is a Delaware corporation with its principal place of business in Indiana. Rush IN is an authorized International dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

43.     During the Class Period Rush IN purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators. Rush IN also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush IN purchased and received both the afore-mentioned Vehicles and Bearings in Indiana. Rush IN has also displayed, sold, and advertised Vehicles in Indiana during the Class Period.

44.     Plaintiff Rush KS is a Delaware corporation with its principal place of business in Kansas. Rush KS is an authorized Hino and Isuzu dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

45.     During the Class Period Rush KS purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators. Rush KS also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush KS purchased and received both

the afore-mentioned Vehicles and Bearings in Kansas. Rush KS has also displayed, sold, and advertised Vehicles in Kansas during the Class Period.

46.     Plaintiff Rush NC is a Delaware corporation with its principal place of business in North Carolina. Rush NC is an authorized International, Peterbilt, Hino, and Isuzu dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

47.     During the Class Period Rush NC purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators. Rush NC also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush NC purchased and received both the afore-mentioned Vehicles and Bearings in North Carolina. Rush NC has also displayed, sold, and advertised Vehicles in North Carolina during the Class Period.

48.     Plaintiff Rush OH is a Delaware corporation with its principal place of business in Ohio. Rush OH is an authorized International, IC Bus, Isuzu, Ford, and Mitsubishi dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

49.     During the Class Period Rush OH purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators. Rush OH also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush OH purchased and received both

13

the afore-mentioned Vehicles and Bearings in Ohio. Rush OH has also displayed, sold, and advertised Vehicles in Ohio during the Class Period.

50.     Plaintiff Rush OK is a Delaware corporation with its principal place of business in Oklahoma. Rush OK is an authorized Peterbilt, Hino, Isuzu, and Ford dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

51.     During the Class Period Rush OK purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators. Rush OK also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush OK purchased and received both the afore-mentioned Vehicles and Bearings in Oklahoma. Rush OK has also displayed, sold, and advertised Vehicles in Oklahoma during the Class Period.

52.     Plaintiff Rush OR is a Delaware corporation with its principal place of business in Oregon. Rush OR is an authorized International dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

53.     During the Class Period Rush OR purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators. Rush OR also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush OR purchased and received both

the afore-mentioned Vehicles and Bearings in Oregon. Rush OR has also displayed, sold, and advertised Vehicles in Oregon during the Class Period.

54.     Plaintiff Rush TN is a Delaware corporation with its principal place of business in Tennessee. Rush TN is an authorized Peterbilt dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

55.     During the Class Period Rush TN purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators. Rush TN also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush TN purchased and received both the afore-mentioned Vehicles and Bearings in Tennessee. Rush TN has also displayed, sold, and advertised Vehicles in Tennessee during the Class Period.

56.     Plaintiff Rush TX is a Texas limited partnership with its principal place of business in Texas. Rush TX is an authorized Peterbilt, Hino, Isuzu, Blue Bird, Micro Bird, Elkhart, and Ford dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

57.     During the Class Period Rush TX purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators. Rush TX also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush TX purchased and received both

the afore-mentioned Vehicles and Bearings in Texas.  Rush TX has also displayed, sold, and advertised Vehicles in Texas during the Class Period.

58.     Plaintiff Rush UT is a Delaware corporation with its principal place of business in Utah.  Rush UT is an authorized International, IC Bus, Autocar, and Mitsubishi Fuso dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

59.     During the Class Period Rush UT purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators.  Rush UT also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush UT purchased and received both the afore-mentioned Vehicles and Bearings in Utah.  Rush UT has also displayed, sold, and advertised Vehicles in Utah during the Class Period.

60.     Plaintiff Rush VA is a Delaware corporation with its principal place of business in Virginia.  Rush VA is an authorized International dealer that purchased and then sold Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators, as well as Bearings manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

61.     During the Class Period Rush VA purchased Vehicles containing Bearings manufactured by one or more of the Defendants or their co-conspirators.  Rush VA also purchased Bearings manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush VA purchased and received both

16

the afore-mentioned Vehicles and Bearings in Virginia.  Rush VA has also displayed, sold, and advertised Vehicles in Virginia during the Class Period.

**The Defendants**

62.     Defendant JTEKT Corporation ("JTEKT Corporation") is a Japanese corporation with its principal place of business in Osaka, Japan.  JTEKT Corporation directly and/or through its wholly owned and/or controlled subsidiaries manufactured, marketed and/or sold Bearings that were purchased throughout the United States, including in this district, during the Class Period.

63.     Defendant Koyo Corporation of U.S.A. ("Koyo") is a South Carolina corporation with its principal place of business in Westlake, Ohio.  It is a subsidiary of and wholly-owned or controlled by its parent, JTEKT Corporation.  Defendant Koyo manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class Period, including by firms that sold such Bearings to Plaintiffs and class members.  During the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

64.     JTEKT Corporation and Koyo also share and have shared numerous executives. Hiroyuki Miyazaki, an executive director at JTEKT Corporation is also a Director at Koyo. Noriya Murase, a Senior Executive Director at JTEKT Corporation, is the former President and Chief Executive Officer of Koyo.

65.     Defendants Koyo and JTEKT Corporation are collectively referred to herein as "JTEKT."

66.     Defendant Nachi-Fujikoshi Corp. ("Nachi-Fujikoshi") is a Japanese corporation with its principal place of business in Toyama, Japan.  Nachi directly and/or through its wholly

DM1\4908432.1

owned and/or controlled subsidiaries manufactured, marketed and/or sold Bearings that were purchased throughout the United States, including in this district, during the Class Period.

67.   Defendant Nachi America Inc. ("Nachi America") is an Indiana corporation with its principal place of business in Greenwood, Indiana.  It is a subsidiary of, and wholly-owned or controlled by, its parent, Nachi-Fujikoshi.  Defendant Nachi America manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class Period, including by firms that sold such Bearings to Plaintiffs and class members.  During the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

68.   Nachi America and Nachi-Fujikoshi also share and have shared numerous executives.  Toru Inoue, a corporate officer at Nachi-Fujikoshi, is listed in its 2013 Company Profile as the President of Nachi America "[i]n Charge of North & Central America."  Nobuo Segawa, a former director at Nachi-Fujikoshi is also a former President of Nachi America.  Makoto Sasaki, a Managing Director and General Manager of Sales Strategy of Nachi-Fujikoshi is the former Chairman of the Board of Nachi America.

69.   Nachi America is referred to in Nachi-Fujikoshi's 2013 Annual Report as one of Nachi-Fujikoshi's "Sales Offices."  Nachi-Fujikoshi's 2013 Annual Report also states that one of Nachi-Fujikoshi's management policies is "creating markets in Japan, Europe, and the USA as new volume zones."  Nachi-Fujikoshi's company profile indicates that it has been "marketing with large OEM customers . . . in America" since 1955.

70.   Defendants Nachi America and Nachi-Fujikoshi are collectively referred to herein as "Nachi."

71.     Defendant NSK Ltd. ("NSK Ltd.") is a Japanese corporation with its principal place of business in Tokyo, Japan.  NSK Ltd. directly and/or through its wholly owned and/or controlled subsidiaries manufactured, marketed and/or sold Bearings that were purchased throughout the United States, including in this district, during the Class Period.

72.     Defendant NSK Americas, Inc. ("NSK Americas") is a Delaware corporation with its principal place of business in Ann Arbor, Michigan.  It is a subsidiary of, and wholly-owned or controlled by, its parent, NSK Ltd.  Defendant NSK Americas manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class Period, including by firms that sold such Bearings to Plaintiffs and class members.  During the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

73.     NSK Ltd.'s Annual Reports set forth aggregate financials for all of the NSK entities.  Sales are reported by the sectors the entities supply, rather than by subsidiary.

74.     NSK Ltd. and NSK Americas have shared numerous executives.  Bernard Lindsay served as COO for NSK Americas and then as Chief Executive Officer, CEO, and Vice President of NSK Ltd.  Masahide Matsubara, a senior Vice President at NSK, Ltd., is the former Chief Executive Officer of NSK Americas.

75.     Defendants NSK Ltd. and NSK Americas are collectively referred to herein as "NSK."

76.     Defendant Schaeffler Group USA Inc. ("Schaeffler") is a Delaware corporation with its principal place of business in Fort Mill, South Carolina.  It is a subsidiary of, and wholly-owned or controlled by, its parent, Schaeffler AG.  Defendant Schaeffler manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this

District, during the Class Period, including by firms that sold such Bearings to Plaintiffs and class members.

77.     Defendant SKF USA, Inc. ("SKF") is a Delaware corporation with its principal place of business in Lansdale, Pennsylvania.  It is a subsidiary of, and wholly-owned or controlled by, its parent, AB SKF.  Defendant SKF manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class Period, including by firms that sold such Bearings to Plaintiffs and class members.

78.     Defendant NTN Corporation ("NTN Corporation") is a Japanese corporation with its principal place of business in Osaka, Japan.  NTN Corporation directly and/or through its wholly owned and/or controlled subsidiaries manufactured, marketed and/or sold Bearings that were purchased throughout the United States, including, in this district, during, the Class Period.

79.     Defendant NTN USA Corporation ("NTN USA") is a Delaware corporation with its principal place of business in Mount Prospect, Illinois.  NTN USA manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class Period, including by firms that sold such Bearings to Plaintiffs and class members. During the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

80.     NTN Corporation and NTN USA have shared a number of executives.  For instance, Tadatoshi Kato, the president of NTN USA is a former Managing Director and Senior Managing Director of NTN Corporation.  Yasunobu Suzuki, the Chairman of the Board and Representative Director at NTN Corporation, is the former Chairman of NTN USA.

81.     NTN USA does not have its own website.  Rather its website is listed on NTN Corporation's website as "NTNAmericas.com."  The homepage of that website indicates that any

American entities view themselves as NTN Corporation, their Japanese parent, and not as separate entities.  The website states of "NTN Americas" that "[a]s the world's third largest bearing manufacturer, we have over 68 plants worldwide and nearly 100 years of premium quality to our name."

82.    Defendants NTN Corporation and NTN USA are collectively referred to herein as "NTN."

## AGENTS AND CO-CONSPIRATORS

83.    Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged.

84.    Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

85.    Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.    **The Bearings Industry**

86.    Bearings are rolling elements that are used to decrease the rotational friction between a vehicle and the surface it runs on.  Among other things, Bearings help maintain balance in the event of speed changes or sudden braking while a Vehicle, such as a truck, is in

21

motion.  Bearings are, among other things, located inside the wheels of Vehicles, where they rotate while the Vehicle is operating, thereby evenly distributing the load of the Vehicle during operation.  Bearings serve an essential role in most Vehicles because they improve performance and allow for smooth operation.  Bearings are prone to wear and tear, and are usually replaced rather than repaired.

87.     Bearings are installed by truck and equipment original equipment manufacturers ("OEMs") in new trucks, buses, commercial vehicles, construction equipment, mining equipment, agricultural equipment, railway vehicles, and other similar vehicles as part of the manufacturing process.  They are also installed in trucks, buses, commercial vehicles, construction equipment, mining equipment, agricultural equipment, railway vehicles, and other similar vehicles to replace worn out, defective or damaged Bearings.

88.     Truck and equipment OEMs including International, Peterbilt, Hino, Isuzu, Mitsubishi Fuso, Autocar and Ford purchased Bearings directly from one or more of the Defendants during the Class Period.

89.     Schaeffler's main customers include Volvo Trucks.

90.     SKF's main customers include PACCAR, which manufactures Peterbilt trucks, and Freightliner.

91.     NTN's main customers include Freightliner.

92.     Defendants and their co-conspirators supplied Bearings to OEMs for installation in Vehicles manufactured and sold in the United States and elsewhere.  Defendants and their co-conspirators manufactured Bearings (a) in the United States for installation in Vehicles manufactured and sold in the United States, (b) abroad for export to the United States and

installation in Vehicles manufactured and sold in the United States, and (c) abroad for installation in Vehicles manufactured abroad for export to and sale in the United States.

93.     Suppliers, including Defendants, supplied OEMs with both Bearings to be installed in vehicles and Bearings to be used for replacement purposes.

94.     OEM replacement Bearings are the same as the Bearings installed in new Vehicles and are, by definition, made by the same manufacturer who made the Bearings originally installed in the Vehicle.  Such OEM replacement parts are not the same as aftermarket parts, which are made by different manufacturers than those who manufactured the original parts.  The prices of OEM replacement Bearings were inflated by Defendants' collusion.

95.     Plaintiffs and members of the proposed Classes indirectly purchased Bearings, either as stand-alone parts, for repair or replacement, or in Vehicles containing Bearings.

96.     The U.S. market size for motor vehicle Bearings was $2.71 billion in 2008.

97.     The Bearings market is dominated and controlled by a small number of manufacturers, which include Defendants.

**B.     Defendants Increased Prices for Bearings in the Face of Declining Demand during the Class Period**

98.     In a competitive market, falling demand leads to decreased prices because competitors need to lower prices to attract customers and increase demand.  In a market where competitors have engaged in a conspiracy to fix prices, however, competitors do not lower prices even when faced with decreasing demand.  Such price decreases are unnecessary because the conspirators know that they will not lose sales to lower-priced competitors.

99.     The price of Bearings increased during the Class Period, even during periods when demand decreased.  In a competitive market, falling demand should not have resulted in

23

rising prices for Bearings.  Such anticompetitive price increases have resulted in Plaintiffs' and members of the Classes paying supracompetitive prices for Bearings.

**C.    The Structure and Characteristics of the Bearings Market.**

100.    The structure and other characteristics of the Bearings market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive. Specifically, the Bearings market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

**1.    The Bearings Market Has High Barriers to Entry.**

101.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing.  Where, however, there are significant barriers to entry into a market, new market entrants are less likely.  Thus, barriers to entry into a market can help to facilitate the formation and maintenance of a cartel in that market.

102.    There are substantial barriers that preclude, reduce, or make more difficult entry into the Bearings market.  A new entrant into that market would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and overcoming longstanding customer relationships.

103.    Research and development is necessary for product innovation because participants in the Bearings market compete primarily based on product pricing.  To compete effectively, an entrant must be committed to spending a significant amount of resources on research and development.

104.    Defendants also own several patents for Bearings.  Those patents place a significant and costly burden on potential new entrants, who must avoid infringing on those

24

patents (or obtain patent licenses from competitors) when entering the market with a new product.

### 2.    There is Inelasticity of Demand for Bearings.

105.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small (or no) decline in the quantity sold of that product.  In ineclastic markets, customers have nowhere to turn for cheaper alternative products or services of similar quality, so they continue to purchase despite a price increase.

106.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion because it allows producers to raise their prices without triggering customer substitution and lost sales revenue.

107.    Demand for Bearings is highly inelastic.  This is because there are no close substitutes for these products.  Additionally, customers must purchase Bearings as essential parts of a Vehicle, regardless of whether prices are kept at supra-competitive levels.  Customers wanting to purchase a truck, bus, commercial vehicle, construction equipment vehicle, mining equipment vehicle, agricultural equipment vehicle, railway vehicle, or other similar vehicle simply have no choice but to purchase Bearings.

### 3.    The Market for Bearings is Highly Concentrated.

108.    A highly concentrated market is more susceptible to collusion and other anticompetitive practices.  There is a high level of concentration among firms in the Bearings market.  The top three suppliers of Bearings control nearly 75 percent of the U.S. market.

DM1\4908432.1

### 4.     Defendants Had Ample Opportunities to Conspire

109.     Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.  According to one confidential witness who was the territory manager of a major Bearings manufacturer, employees of Defendants often ran into and spoke to one another at trade shows.

110.     In addition, SKF, NSK, NTN, Koyo, Nachi-Fujikoshi, and Schaeffler are six of the members of the seven-member World Bearing Association ("WBA").  The WBA is not registered, not incorporated, has no Articles of Association, has no record of any meetings and does not file documents with any government entity anywhere in the world.

111.     Golf outings organized by Bearings distributors presented additional opportunities for employees of the defendant companies to conspire.  It was not uncommon for such golf outings to draw more employees from Bearings manufacturers than from distributors. Defendants' employees were often paired together as part of the golf outings.

112.     During such meetings and golf outings, Defendants and their co-conspirators had the opportunity to engage in private meetings, conversations, and communications to discuss pricing and customer allocation for Bearings sold in the United States.

113.     Defendants also had opportunities to conspire and trade information pursuant to the numerous acquisitions in the Bearings industry over the past five years.  For example, The Timken Company announced at the end of 2009 that it sold its Needle Roller Bearings business to JTEKT.

114.     On information and belief, Defendants also sell products, including Bearings, to one another as a general business practice.  Defendants and their co-conspirators routinely produced and sold Bearings to each other.  For example, at times, a particular manufacturer

DM1\4908432.1

would shut down a product line (i.e. cease production of a particular size or type of bearing) while maintaining the item on its price list.  If a customer ordered a product that was no longer being produced, the nonproducing manufacturer would purchase it from a competitor.  To facilitate such purchase and sales transactions, senior level employees, a General Manager or President of the Defendant manufacturer, would meet or communicate to discuss and finalize these arrangements.  These transactions provided numerous additional opportunities for Defendants to collude on customer allocation and pricing structures in the U.S. Bearings market.

### D.   <u>Government Investigations</u>

115.    Globally-coordinated Investigations into the Bearings industry are underway in the United States, Canada, South Korea, Singapore, Australia, Japan, and Europe.

116.    The DOJ is conducting an investigation into the Bearings industry.  In November 2011 the DOJ served a subpoena on NTN's "United States consolidated subsidiary requesting the submission of information related to transactions in bearings."  NTN's 2013 Annual Report indicated that: (1) NTN and two of its former executives were indicted by the Tokyo District Prosecutors Office on suspicion of having violated Japan's Antimonopoly Act, (2) NTN received a cease and desist order and surcharge payment order for ¥7.231 billion from the JFTC, (3) a consolidated subsidiary of NTN in South Korea underwent an on-site inspection by the Korea Fair Trade Commission in July of 2012, (4) NTN's Singapore subsidiary underwent an inspection from Competition Commission Singapore, and (5) that NOT and its subsidiaries were under investigation by the authorities in the United States and European Union.

117.    Schaeffler's 2013 Annual Report states that it and some of its subsidiaries are being investigated by several antitrust authorities, including those in the European Union, regarding possible agreements violating antitrust laws and has determined that the investigation by the EU antitrust authorities have become sufficiently concrete for the Schaeffler Group to

DM1\4908432.1

recognize a provision in its consolidated financial statements in December 2013 for liability in the amount of EUR 380 million for the risk of a potential penalty. Schaeffler's 2013 Annual Report further states that the amount of potential penalties arising out of the other pending antitrust investigations is "uncertain, but could be significant."

118.    NSK's 2013 Annual Report states that: (1) its subsidiary in the U.S. received a subpoena in connection with the DOJ's Bearings investigation, (2) its manufacturing and sales subsidiary in South Korea was investigated by the Korea Fair Trade Commission in relation to the Monopoly Regulation and Fair Trade Act, (3) its sales subsidiary in Singapore was investigated by the Competition Commission Singapore in relation to the Competition Act, and (4) its subsidiaries in "other countries" are "undergoing investigation by the relevant authorities."

119.    SKF's 2013 Annual Report indicates that it is part of the investigations by The European Commission, DOJ, and Korea Fair Trade Commission regarding possible antitrust violations in the bearings industry.

120.    The JFTC launched an investigation in July 2011 after Defendant JTEKT sought leniency by alerting the regulatory agency of the Bearings conspiracy.  JTEKT voluntarily confessed to the conspiracy and was exempted from a criminal complaint by the JFTC.

121.    On July 26, 2011, the JFTC conducted on-site inspections of Defendants NSK, NTN, JTEKT and Nachi-Fujikoshi amid suspicions that the companies violated Japan's antimonopoly law and fixed prices.

122.    In its 2011 Annual Report, NSK stated that it "intend[ed] to cooperate fully with the [JFTC] investigation" after acknowledging that "in July 2011 the Japan Fair Trade commission conducted on-site investigations of NSK on suspicion that sales of certain products infringed upon Japan's Antimonopoly Act."

28

123.     NTN reported in its 2011 Financial Report that:

> [i]n July, the Company underwent an on-site inspection by the
> Japan Fair Trade Commission into domestic transactions on
> bearings, on suspicion that the Company had decided to raise sale
> prices in cooperation with other manufacturers, and in April this
> year a search was carried out by special investigators from Tokyo
> District Public Prosecutor's Office and the Fair Trade
> Commission.

124.     A press release on JTEKT's website states that it was inspected by the Tokyo

District Public Prosecutor's Office on April 20, 2012.

125.     The Japan Times has reported that certain NTN officials have made statements

admitting to their participation in the conspiracy to fix prices on bearings during voluntary

questioning by Japanese prosecutors.  Officials of NSK, JTEKT and Nachi-Fujikoshi have

already admitted to their roles in the conspiracy.

126.     According to sources, the JFTC said it "believes the culture of collusion is

ingrained in the bearing industry." In 1973, the JFTC similarly found that NSK, Koyo Seiko Co.

(currently JTEKT), Nachi-Fujikoshi and NTN Toyo Bearing Co. (currently NTN) formed a

cartel and held secret meetings at which they fixed bearings prices.  In 2002, the French Conseil

de la Concurrence (Competition Council) fined four bearings manufacturers €19 million for their

participation in a price-fixing cartel that was active from 1993 through 1997.  The cartel included

corporate entities related to three participants in the present Bearings price-fixing cartel: SKF,

Schaeffler, and NSK.

127.     In the mid 1980's, Japanese-based Bearings manufacturers, including the

Defendants and/or their corporate parents (the "Japanese Defendants") regularly colluded to fix

sale prices for Bearings.  During this time the executives of those companies participated in

telephone conferences to discuss pricing for Bearings customers and markets.

128.    The Japanese Defendants entered into mutual agreements not to compete for their Bearings customers.  Their sales employees were not allowed to solicit business from Bearings customers from the other Japanese Defendants.  If there was an issue about prices and customers, the supervisors of the Japanese Defendants would meet to determine who from their group would sell to a given Bearings customer and what price would be charged for the sale.

129.    On June 14, 2012, the Japan Fair Trade Commission ("JFTC") filed a criminal accusation that found a criminal violation of the Japan's Antimonopoly Act against NSK Ltd, NTN Corp., and Nachi-Fujikoshi Corp.  According to the Japan Times, the three companies have raised Bearings prices five times since 2004 and the JFTC believes that these price increases were the result of cartel activity.

130.    On November 8, 2011, the European Commission ("EC") announced that it had made unannounced inspections at the premises of companies that manufacture Bearings over concerns that these companies may have violated antitrust rules.

131.    On July 15, 2013, the Australian Competition and Consumer Commission ("ACCC") announced it had instituted civil proceedings in the Australian Federal Court against Koyo Australia Pty Ltd. (Koyo) – sister company of Defendant Koyo – for alleged cartel conduct relating to the supply of ball and roller bearings for use in motor vehicles.  The ACCC alleges that Koyo and at least two of its competitors made and gave effect to cartel arrangements for an increase to the price of Bearings.

### E.    Government Fines

132.    Nachi-Fujikoshi's 2012 Business Report confirms that on December 28, 2012, Nachi-Fujikoshi and two of its executives were convicted in Tokyo District Court of violating Japan's Antimonopoly Act.  Keiichi Ogino, a former member of the company's board of directors, was sentenced to fourteen months in prison and suspended for three years, and Michio

Murai, a former deputy chief of the company's Bearings Division, was sentenced to twelve months in prison and was also suspended for three years.  The Tokyo District Court also issued a ¥180 million criminal fine against Nachi-Fujikoshi.

133.    On February 25, 2013, Defendant NSK Ltd. announced that the company was sentenced to a penalty of ¥380 million by the Tokyo District Court for violation of the Antimonopoly Act of Japan regarding sales of Bearings as a result of the June 14, 2012 prosecution by the Tokyo District Public Prosecutors Office.  In addition, two of NSK's former officers and a former employee received suspended sentences.  Keisuke Takagawa and Katsumi Kuwabara, both former NSK senior vice presidents, were sentenced to fourteen months in prison, while NSK executive Yoshi Nishiyama was sentenced to twelve months in prison.

134.    On February 25, 2013, Nikkei Japan Business Newspaper reported that the presiding judge stated, "[t]he crime is malicious – large in scope and carried out systematically. Having the largest market share, NSK carried out the central role in this cartel."

135.    On March 29, 2013 the JFTC issued Cease and Desist Orders against NTN Corp., NSK, Ltd. and Nachi-Fujikoshi Corp, based on their violation of the Antimonopoly Act, through participation in a conspiracy to fix the prices of industrial machinery bearings and automotive bearings.  All three companies were required to pay fines totaling ¥13.36 billion.

136.    JTEKT was also mentioned as a violator, but was not subject to a fine or cease and desist order due to its leniency status.

137.    The press release accompanying the Order stated that the violators "conspired in sales of industrial machinery bearings and automotive bearings."

138.    JTEKT announced on July 13, 2013, that on July 12, 2013, it was ordered by the Quebec Superior Court of Justice to pay a $5 million fine for violating the Canadian Competition

Act.  It stated that it cooperated with the Canadian Competition Bureau and negotiated a plea agreement with the Bureau.  JTEKT pleaded guilty to two counts of bid-rigging.

139.    JTEKT secretly conspired with NSK to submit bids or tenders in response to requests for quotations ("RFQs").  These agreements were reached, at least in part, through direct communications between JTEKT sales management level personnel and their counterparts at NSK, where the employees discussed, among other things, how to coordinate their respective responses.  These discussions resulted in an agreement whereby JTEKT would win certain RFQs while NSK would win others.

140.    The Canadian Competition Bureau's press release regarding the fine stated that "The Bureau became aware of the bearings cartel by way of its Immunity Program.  Under the Immunity Program, the first party to disclose to the Bureau an offence not yet detected or to provide evidence leading to a referral of evidence to the Public Prosecution Service of Canada (PPSC) may receive immunity from the PPSC, provided that it fully cooperates with the Bureau's investigation and any ensuing prosecution.  Subsequent cooperating parties may receive lenient treatment under the Bureau's Leniency Program.  These programs provide powerful incentives for organizations and individuals to come forward and cooperate with the Bureau's investigations.  JTEKT participated in the Bureau's Leniency Program and provided substantial assistance to the Bureau and the PPSC."

141.    On January 30, 2014, the Canadian Competition Bureau announced that NSK had pleaded guilty to two counts of bid-rigging under the Canadian Competition Act in connection with automotive wheel hubs and was being fined $4.5 million for its participation in an international bid-rigging cartel involving Bearings.

DM1\4908432.1

142.    On March 19, 2014, the EC announced that it had found that SKF, Schelffler, JTEKT, NKS, Nachi-Fujikoshi, and NTN had operated a cartel in the market for car and truck bearings and fined all those companies (excluding JTEKT, which benefitted from immunity for having revealed the existence of the cartel to the EC) a collective EUR 953 million.

143.    On August 19, 2014, China's National Development and Reform Commission announced that it had handed down a 174.92 million yuan penalty against NSK and a 119.16 million yuan fine against NTN for violating China's antitrust law in connection with the Bearings cartel.

F.    **Criminal Pleas in the United States Related to Conspiracies in the Automotive Parts Industry**

144.    A number of other manufacturers of other automotive parts have pleaded guilty, or agreed to plead guilty, to price fixing and bid rigging in the automotive parts industry, including:  Furukawa Electric Co., Ltd.; Yazaki Corp.; G.S. Electech, Inc.; Fujikura Ltd.; Denso Corporation; Autoliv, Inc., and TRW Deutschland Holdings, GmBH, and Nippon Seiki Co. Ltd. These companies have pleaded guilty to engaging in price-fixing conduct with regard to Automotive Wire Harness Systems, Instrument Panel Clusters, Fuel Senders, Occupant Safety Systems and Heater Control Panels.  These violators have paid almost $1 billion in fines.  The majority of these violators pleaded guilty to engaging in bid-rigging, price-fixing, and market allocation during the same time period as the Class Period of the Bearings conspiracy, with multiple OEMs as their targets.

G.    **Likely Existence of An Amnesty Applicant**

145.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the U.S. Department of Justice.  In most recent cases in which guilty pleas for

33

price-fixing conduct have been obtained, there has been a cooperating party who has been accepted into the DOJ's ACPERA program as an amnesty applicant. One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that the applicant is not charged with a criminal offense and is not required to plead guilty to criminal charges.

146.    In light of the multiple guilty pleas in related automotive parts antitrust cases, the DOJ's ongoing investigation into the Bearings industry, the fine paid in Canada by JTEKT (as well as JTEKT's admission of its participation in the price-fixing conspiracy), and the existence of an amnesty applicant in the JFTC proceedings, it is reasonable to infer that there is an ACPERA "amnesty applicant" in the DOJ's Bearings investigation, as well.

> **H.    Damage to Plaintiffs and Class Members Caused by Defendants' Illegal Activities.**

147.    Deputy Assistant Attorney General Scott Hammond, recently stated that the automotive parts cartel is "the biggest [cartel] with respect to the impact on U.S. business and consumers."

148.    Defendants' conspiracy resulted in Defendants charging inflated prices to firms who directly purchased Bearings from them and in those purchasers raising their prices to subsequent purchasers.

149.    Having paid higher prices for components of the trucks, buses, commercial vehicles, construction equipment, mining equipment, agricultural equipment, railway vehicles, and other similar vehicles they sold to Plaintiffs and the Classes and the Bearings they sold to Plaintiffs and the Classes, firms who sold such Bearings and Vehicles passed Defendants' overcharges on to Plaintiffs and the Classes.

150.    Plaintiffs and the Classes are entitled to recover the overcharges they paid for Bearings.

DM1\4908432.1

151.    Because, among other reasons, of the imperfect nature of competition among truck and equipment dealers and the differentiation among such dealers by brand and by location, Plaintiffs and the Classes had to and did absorb, at the very least, a significant portion of the overcharges that they paid due to Defendants' illegal activities.

152.    Plaintiffs have standing and have suffered damage compensable by indirect purchaser laws and they and members of the classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy.

## CLASS ACTION ALLEGATIONS

153.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All dealers of heavy-duty (Class 8) trucks, medium-duty (Class 4, 5, 6 & 7) trucks, buses, commercial vehicles, construction equipment, mining equipment, agricultural equipment, railway vehicles, and other similar vehicles that during the Class Period, (a) purchased Bearings manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased Vehicles containing Bearings manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

154.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, unjust enrichment and consumer protection laws of the states whose laws are set forth in the Second and Third Claims below, as well as the unjust enrichment laws of Missouri, Massachusetts and Illinois.  The states whose laws are set forth in the Second and Third Claims below, as well as Missouri, Massachusetts, and Illinois, are collectively referred to as the "Indirect Purchaser States."   These claims are brought by Plaintiffs on behalf of

themselves and entities in the Indirect Purchaser States listed in the Second, Third and Fourth

Claims as follows (the "Damages Class"):

> All dealers of heavy-duty (Class 8) trucks, medium-duty (Class 4, 5, 6 & 7) trucks, buses, commercial vehicles, construction equipment, mining equipment, agricultural equipment, railway vehicles, and other similar vehicles in the Indirect Purchaser States, that, during the Class Period (a) purchased Bearings manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or (b) purchased Vehicles containing Bearings manufactured by one of the Defendants or any current or former subsidiary, affiliate or co-conspirator thereof.

155.    The Nationwide Class and the Damages Class are referred to herein as the

"Classes."  Excluded from the Classes are Defendants, their parent companies, subsidiaries and

affiliates, any co-conspirators, federal governmental entities, and instrumentalities of the federal

government, states, and their subdivisions, agencies, and instrumentalities.

156.    Although Plaintiffs do not know the exact number of the members of the Classes,

Plaintiffs believe there are at least thousands of members in each Class.

157.    Common questions of law and fact exist as to all members of the Classes.  This is

particularly true given the nature of Defendants' conspiracy, which was generally applicable to

all the members of both Classes, thereby making appropriate relief with respect to the Classes as

a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

> (a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Bearings sold in the United States;

> (b)    The identity of the participants of the alleged conspiracy;

> (c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

> (d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

36

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief;

(f)      Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of Bearings sold in the United States during the Class Period;

(i)      Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

(j)      The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

158.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct because they paid artificially inflated prices for Bearings purchased indirectly from Defendants or their co-conspirators.

159.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

DM1\4908432.1

160.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

161.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism provide injured entities with a method for obtaining redress for claims that might not be practicable to pursue individually and substantially outweigh any difficulties that may arise in the management of this class action.

162.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

163.     Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to Bearings;

(b)     The prices of Bearings have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Defendants charged purchasers of their Bearings inflated, fixed and stabilized prices for such Bearings;

(d)     Firms who sold Defendants' Bearings and vehicles to Plaintiffs and the Classes passed Defendants' overcharges on to them;

(e)     Defendants' overcharges passed through each level of distribution as they traveled to Plaintiffs and the Classes; and

38

(f)     Bearing dealers purchasing Bearings and vehicles containing Bearings have been deprived of free and open competition and have paid inflated prices for Bearings.

164.    During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Bearings, as a result of Defendants' conspiracy.

165.    An increase in the prices of Bearings caused an increase in the prices of Vehicles during the Class Period.

166.    The market for Bearings and the markets for heavy-duty (Class 8) trucks, medium-duty (Class 4, 5, 6 & 7) trucks, buses, commercial vehicles, construction equipment, mining equipment, agricultural equipment, railway vehicles, and other similar vehicles are inextricably linked and intertwined because the market for Bearings exists to serve the Vehicle market.  The Bearings at issue in this complaint have no independent utility and little to no value aside from their value as Vehicle components.  The Bearings at issue in this complaint must be installed in Vehicles to serve any function.  Indeed, the demand for Vehicles creates the demand for Bearings.

167.    Bearings are identifiable, discrete physical products that remain essentially unchanged when incorporated into a Vehicle and are not altered during the manufacturing process.  As a result, Bearings follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Bearings can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

168.    Just as Bearings can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Bearings affect prices paid by indirect purchasers of Vehicles containing Bearings.

169.    Bearings have their own unique part numbers, which permit them to be traced.

170.    Bearings are pieces of sophisticated equipment that are necessary to permit the operate a Vehicle.

171.    Bearings are found in every modern vehicle and can be removed from a finished Vehicle and replaced.

172.    The Bearings at issue in this lawsuit only have one use: to be inserted into Vehicles.

173.    Bearings comprise a material portion of the cost of a Vehicle.

174.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig, or stabilize the price of Bearings and, as a direct and foreseeable result, the price of new Vehicles containing Bearings and the price of Bearings purchased for repair purposes.  Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis—called regression analysis—is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product or service that is an assemblage of costs.  Thus, it is possible to isolate and identify only the impact of an increase in the price of Bearings on prices for new Vehicles even though such products contain a number of other components whose prices may be changing over time.  A regression model can explain how variation in the price of Bearings affects changes in the price of new Vehicles.  In such models, the price of Bearings would be treated as an independent or explanatory variable.  The model can isolate how changes in the price of Bearings impact the price of new Vehicles containing Bearings while controlling for the impact of other price-determining factors.

40

175.    The precise amount of the overcharge impacting the prices of new Vehicles containing Bearings can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution.  Thus, the economic harm to Plaintiffs and members of the Classes can be quantified.

176.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Bearings than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent and Plaintiffs' and Class members' damages are measureable.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

I.    **The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover the Claims**

177.    Plaintiffs repeat and reallege the allegations set forth above.

178.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until the public announcements of the government investigations into Bearings price-fixing began in July 2011.

179.    Plaintiffs and the members of the Classes purchased Vehicles or purchased Bearings to replace or repair damaged, defective, or worn Bearings.

180.    No information in the public domain was available to the Plaintiffs and the members of the Classes prior to the public announcements of the government investigations beginning in July 2011 that revealed sufficient information to suggest that any one of the

41

Defendants was involved in a criminal conspiracy to price-fix Bearings.  Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein.

181.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

**J.      Fraudulent Concealment Tolled the Statute of Limitations**

182.    In the alternative, the statutes of limitations on the claims asserted herein by Plaintiffs and the Classes are tolled pursuant to the doctrine of fraudulent concealment.  Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the public announcement of the government investigations into Bearings price-fixing began.

183.    Because Defendants' agreements, understandings and conspiracies were kept secret until July 2011, Plaintiffs and members of the Classes were unaware before that time of Defendants' unlawful conduct, and they did not know before then that they were paying supracompetitive prices for Bearings throughout the United States during the Class Period.

184.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

185.    Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss the price-fixing and bid-rigging conduct they engaged in to carry out their conspiracy.

42

186.     By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing.  Bearings are not exempt from antitrust regulation and, thus, before July 2011, Plaintiffs reasonably considered the Bearings industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Bearings prices before July 2011.

187.     Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

188.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed until July, 2011 when reports of the investigations into anticompetitive conduct concerning Bearings were first publicly disseminated.

189.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

DM1\4908432.1

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

190.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

191.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

192.    At least as early as January 1, 2004, and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Bearings, thereby creating anticompetitive effects.

193.    The anticompetitive acts were intentionally directed at the United States market for Bearings and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Bearings throughout the United States.

194.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Bearings.

195.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Bearings have been harmed by being forced to pay inflated, supracompetitive prices for Bearings and vehicles containing Bearings.

196.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

197.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for Bearings has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for Bearings sold by Defendants and their coconspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States;

(c)    Prices for Vehicles purchased by Plaintiffs and the members of the Nationwide Class containing Bearings manufactured by Defendants and their coconspirators were inflated; and

(d)    Plaintiffs and members of the Nationwide Class who purchased Bearings indirectly from Defendants have been deprived of the benefits of free and open competition.

198.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Bearings and Vehicles containing Bearings than they would have paid and will pay in the absence of the conspiracy.

199.    Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Bearings and Vehicles containing Bearings.

200.    Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Bearings and Vehicles containing Bearings because they are required to purchase Vehicles and Bearings to continue to operate their businesses.

DM1\4908432.1

201.    Plaintiffs and members of the Nationwide Class continue to purchase Vehicles and Bearings on a regular basis.

202.    Vehicles and Bearings continue to be sold at inflated and supracompetitive prices.

203.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

204.    Plaintiffs and members of the Nationwide Class will be at the mercy of Defendants' unlawful conduct until the Court orders an injunction.

205.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF

### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

206.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

207.    From as early as January 1, 2004 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Bearings in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below.

208.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize and/or maintain artificially supracompetitive prices for Bearings in the United States.

209.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Bearings at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize

46

effective prices paid by Plaintiffs and members of the Damages Class with respect to Bearings sold in the United States;

(b)    allocating customers and markets for Bearings in the United States in furtherance of their agreements; and

(c)    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

210.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to Bearings.

211.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

212.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

47

(d)     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

213.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Bearings at supracompetitive levels.

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Bearings.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Bearings; and (2) allocating among themselves the production of Bearings.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California:  (1) Price competition in the sale of Bearings has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for

Bearings sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Bearings or Vehicles containing Bearings manufactured by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Bearings than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

214.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Official Code §§ 28-4501, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Bearings or Vehicles in the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Bearings or Vehicles in the District of Columbia,

DM1\4908432.1

paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings, including in the District of Columbia.

(b)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

215.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

(a)     Defendants' unlawful conduct had the following effects:  (1) Bearings' price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Bearings' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

50

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

216.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

51

217.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

218.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Maine; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and

open competition:  and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10. §§ 1101, *et seq.*

219.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

DM1\4908432.1

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp.  Laws Ann. §§ 445.771, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

220.    Defendants have entered into an unlawful agreement in unreasonable restraint of trade in violation of the Minnesota Statutes Annotated §§ 325D.49, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b)      During the Class Period Defendants' illegal conduct substantially affected Minnesota commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.*  Accordingly, Plaintiffs and

54

members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

221.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Bearings or Vehicles in Mississippi were deprived of free and open competition, including in Mississippi:  and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Bearings or Vehicles in Mississippi paid supracompetitive, artificially inflated prices for Bearings, including in Mississippi.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

222.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

223.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who

56

resided in Nevada and/or purchased Bearings or Vehicles in Nevada, were deprived of free and open competition including in Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Bearings or Vehicles in Nevada, paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings, including in Nevada.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.060, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

224.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

DM1\4908432.1

(b)     During the Class Period Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

225.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann.§§ 57-1-1, *et seq.*

226.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout New York; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Bearings or vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York, paid supracompetitive, artificially inflated prices for Bearings when they purchased, including in New York, Bearings or Vehicles containing Bearings, or purchased, including in New York, Bearings or Vehicles that were otherwise of lower quality, than would have been absent the conspirators' illegal acts, or were unable to purchase Bearings or Vehicles that they would have otherwise have purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*.  The conduct set forth above is a per se violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

227.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Bearings or Vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Bearings or Vehicles in North Carolina, paid supracompetitive, artificially inflated prices for Bearings and Vehicles including in North Carolina.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(c)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq*.

60

228.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

229.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and

61

open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b)      During the Class Period Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

230.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1., *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Bearings or Vehicles in South Dakota, were deprived of free and open competition including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Vehicles or Bearings in South Dakota, paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings including in South Dakota.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

231.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Bearings or Vehicles in Tennessee, were deprived of free and open competition including in Tennessee; and (4) Plaintiffs and members of the Damages Class, including those who resided in Tennessee, and/or purchased Bearings or Vehicles in Tennessee, paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings including in Tennessee.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.  As a direct and proximate result of Defendants' unlawful

conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(c)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

232.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Utah; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

DM1\4908432.1

233. Defendants have entered into an unlawful agreement in restraint of trade in violation of the 9 Vermont Stat. Ann. §§ 2451, *et seq.*

(a) Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b) During the Class Period Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 9 Vermont Stat. Ann. §§ 2451, *et seq.* Plaintiffs are entitled to relief pursuant to 9 Vermont Stat. Ann. § 2465 and any other applicable authority. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann. §§ 2451, *et seq.*

234. Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

(a) Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels

throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Bearings or Vehicles in West Virginia, were deprived of free and open competition including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Vehicles or Bearings in West Virginia, paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings including in West Virginia.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

235.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

DM1\4908432.1

(b)     During the Class Period Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

236.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.  Plaintiffs and members of the Damages Class have paid more for Bearings and Vehicles containing Bearings than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

237.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

238.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

DM1\4908432.1

**THIRD CLAIM FOR RELIEF**

**Violation of State Consumer Protection Statutes
on behalf of Plaintiffs and the Damages Class**

239.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

240.   Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

241.   Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101.

(a)   Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Bearings were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)   The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)   Defendants' unlawful conduct had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(d)   During the Class Period, Defendants' illegal conduct substantially affected

(e)     Arkansas commerce and consumers.

(f)     As a direct and proximate result of the unlawful conduct of the

Defendants, Plaintiffs and the members of the Damages Class have been injured in their business

and property and are threatened with further injury.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly,

Plaintiffs and the members of the Damages Class seek all relief available under that statute.

242.    Defendants have engaged in unfair competition or unfair, unconscionable,

deceptive or fraudulent acts or practices in violation of California Business and Professions Code

§ 17200, *et seq.*

(a)     During the Class Period, Defendants marketed, sold, or distributed

Bearings in California, and committed and continue to commit acts of unfair competition, as

defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging

in the acts and practices specified above.

(b)     During the Class Period, Defendants' illegal conduct substantially affected

California commerce and consumers.

(c)     This claim is instituted pursuant to Sections 17203 and 17204 of the

California Business and Professions Code, to obtain restitution from these Defendants for acts, as

alleged herein, that violated Section 17200 of the California Business and Professions Code,

commonly known as the Unfair Competition Law.

(d)     The Defendants' conduct as alleged herein violated Section 17200.  The

acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged

herein, constituted a common, continuous, and continuing course of conduct of unfair

69

competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.,* including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.,* of the California Business and Professions Code, set forth above;

(e)     Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.,* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(f)     Defendants' acts or practices are unfair to purchasers of Bearings (or Vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)     Defendants' unlawful conduct had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout California; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/ or purchased Bearings or Vehicles in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Bearings or Vehicles in California, paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings, including in California.

(h)     Defendants' acts and practices are unlawful, fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

70

(i)      The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(j)      The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Bearings (or Vehicles containing them).  Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(k)      As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

243.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a)      Defendants' unlawful conduct had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Florida; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings.

71

(b)      During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      Defendants have engaged in unfair competition or unlawful, unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.,* and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

244.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Bearings were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)      Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Bearings.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing Bearings because they were unaware of the unlawful overcharge and because they had to purchase Bearings as part of the Vehicles they had to purchase in order to operate their dealerships and in order to be able to repair Vehicles through their dealerships.  Defendants' conduct with regard to sales of Bearings, including their illegal conspiracy to secretly fix the

72

price of Bearings at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.

(c)   The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Bearings as set forth in N.M.S.A. § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for Vehicles and Bearings. Defendants' unlawful conduct had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(d)   During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(e)   As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.,* and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

DM1\4908432.1

245.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Bearings were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the Bearings they had purchased as replacements and as component parts of Vehicles had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

(c)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Bearings were misled to believe that they were paying a fair price for Bearings or the price increases for Bearings were for valid business reasons; and similarly situated purchasers were potentially affected by Defendants' conspiracy.

(e)     Defendants' unlawful conduct had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout New York; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, who resided in and/or made purchases

74

of Vehicles or Bearings in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of Vehicles and Bearings in New York, paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings, and were subjected to Defendants' deceptive practices.

       (f)     Defendants knew that their unlawful trade practices with respect to pricing Bearings would have an impact on all purchasers in New York and not just the Defendants' direct customers.

       (g)     Defendants knew that their unlawful trade practices with respect to pricing Bearings would have a broad impact, causing class members who indirectly purchased Bearings to be injured by paying more for Bearings than they would have paid in the absence of Defendants' unlawful trade acts and practices.

       (h)     During the Class Period, Defendants marketed, sold, or distributed Bearings in New York and their illegal conduct substantially affected New York commerce and New York purchasers.

       (i)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled manufactured, sold, and/or distributed Bearings in New York.

       (j)     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

246.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Bearings were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injuries to purchasers of Bearings and Vehicles, and broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)     Defendants' unlawful conduct had the following effects upon purchasers of Bearings in North Carolina:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Bearings or Vehicles in North Carolina, were deprived of free and open competition including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Bearings or Vehicles in North Carolina, paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings including in North Carolina.

(d)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of Bearings and vehicles.  Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of

DM1\4908432.1

Defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware.  Moreover, Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

(e)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, marketed, sold and/or distributed Bearings in North Carolina.

(f)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

247.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.,* and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

248.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Bearings were sold, distributed, or obtained in Vermont.

(b)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Bearings.  Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence.  Defendants misrepresented to all purchasers during the Class Period that Defendants' Bearings prices were competitive and fair.

(c)     Defendants' unlawful conduct had the following effects:  (1) Bearings price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Bearings and Vehicles containing Bearings.

DM1\4908432.1

(d)      As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(e)      Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Bearings, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Bearings at prices set by a free and fair market.  Defendants' misleading conduct and unconscionable activities constitute unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### FOURTH CLAIM FOR RELIEF

**Unjust Enrichment**
**on behalf of Plaintiffs and the Damages Class**

249.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

250.    Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra*, excluding California.  Plaintiffs also bring this claim under the laws of Missouri, Massachusetts and Illinois on behalf of the Plaintiffs who have their primary places of business in those three states and the class members in those three states.

251.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Bearings.

DM1\4908432.1

252.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Bearings.

253.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

254.    Pursuit of any remedies against the firms from whom Plaintiffs and the Class members purchased Vehicles containing Bearings and Bearings subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.    The unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)    A *per se* violation of Section 1 of the Sherman Act;

(c)      An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)      Acts of unjust enrichment by Defendants as set forth herein.

C.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

81

G.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  August 29, 2014

Respectfully submitted,

s/ J. Manly Parks
DUANE MORRIS LLP
Wayne A. Mack
J. Manly Parks
30 S. 17th Street
Philadelphia, PA 19103
Telephone: (215) 979-1000
Facsimile: (215) 979-1020
wamack@duanemorris.com
jmparks@duanemorris.com

*Attorneys for Truck and Equipment Dealer Plaintiffs*

82

DM1\4908432.1